1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SIRF TECHNOLOGY INC.,

        Plaintiff,

  v.

ORRICK HERRINGTON AND SUTCLIFFE LLP,

        Defendant.

_____/

No. C 09-04013 MHP

**MEMORANDUM & ORDER**

**Re: Defendant Orrick, Herrington and Sutcliffe LLP's Motion for Partial Summary Judgment**

      Plaintiff SiRF Technology, Inc. ("SiRF") brought this action against defendant Orrick, Herrington, & Sutcliffe LLP ("Orrick") alleging professional negligence, breach of contract, breach of fiduciary duty and misrepresentation claims. These claims arise out of Orrick's representation of SiRF in a patent dispute before the International Trade Commission ("ITC"). Now before the court is Orrick's motion for partial summary judgment to dismiss some but not all of the prefessional malpractice claims. Having considered the parties' arguments and submissions and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND[1]

      SiRF manufactures products involving Global Positioning System ("GPS") technology. Docket No. 43 (Cooper Dec.), Exh. A (596 Complaint) ¶ 1.2. In December 2006, SiRF filed a patent infringement action in federal district court against a competing producer of GPS-related products, Global Locate, Inc. ("Global Locate"). *Id.*, Exh. C (Press Release). In February 2007, SiRF,

United States District Court

For the Northern District of California

represented by MacPherson Kwok Chen & Heid LLP ("MKCH"), filed a related complaint with the ITC alleging that Global Locate infringed three SiRF patents in violation of section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337.  596 Complaint ¶¶ 1.1 & 1.3.  That action will be referred to as the "596 Investigation" throughout this order.  As a general matter, proceedings at the ITC culminate in an evidentiary hearing before an Administrative Law Judge ("ALJ"), who then issues an Initial Determination regarding patent infringement and remedies.  An Initial Determination is subject to review by the full Commission, which issues a Final Determination.

Global Locate filed its own ITC complaint in March 2007 alleging that SiRF infringed six Global Locate patents in violation of section 337.  Cooper Dec., Exh. D (602 Complaint) ¶¶ 1 & 3.  That second ITC action will be referred to as the "602 Investigation" throughout this order.  SiRF retained Orrick to defend it in the 602 Investigation.  *Id.*, Exh. F (Engagement Letter).  Broadcom Corporation ("Broadcom") acquired Global Locate in July 2007.  Global Locate and Broadcom will be referred to collectively as Broadcom throughout this order.

In an Initial Determination issued on August 8, 2008, the ALJ in the 602 Investigation found that SiRF had infringed all six of the Broadcom patents at issue in the dispute.  Cooper Dec., Exh. X (Initial Determination) at 214.  The Commission granted a limited review of the Initial Determination and later denied SiRF's petition for reconsideration of the decision to not review certain issues.  Cooper Dec., Exh. Y (Final Determination) at 2.  In its Final Determination issued on January 15, 2009, the ITC modified the Initial Determination only to clarify the ALJ's findings.  *Id.* The ITC issued a Limited Exclusion Order prohibiting the importation and sale of certain SiRF products into and within the United States, *id.* (Limited Exclusion Order) at 2, and a similar Order to Cease and Desist, *id.* (Order to Cease and Desist).  SiRF retained new counsel and appealed the decision to the Court of Appeals for the Federal Circuit, challenging both the Final Determination and those elements of the ALJ's Initial Determination that the Commission had declined to review. *See SiRF Techn., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010).  On April 12, 2010, the Federal Circuit held that the Commission had properly limited review of the Initial Determination and affirmed the Final Determination.  *Id.*

**United States District Court**
For the Northern District of California

1       SiRF brought the instant action against Orrick in California Superior Court in August 2009,

2   Docket No. 1 (Notice of Removal), Exh A (Compl.) at 1, and Orrick promptly removed the action to

3   federal court, Notice of Removal at 2.  SiRF alleges that, in the course of Orrick's representation of

4   SiRF throughout the 602 Investigation, Orrick committed professional negligence, breached its

5   contract with SiRF, breached its fiduciary duty to SiRF and made misrepresentations to SiRF.

6   SiRF's claims of professional negligence, which are at issue in Orrick's motion, focus on Orrick's

7   conduct in relation to critical expert reports that Orrick filed after a relevant deadline and that were

8   subsequently excluded from the administrative record, the allegedly unprofessional manner in which

9   Orrick argued for certain constructions of the relevant patent claims, and Orrick's alleged failure to

10  adequately advise SiRF of the risks it faced in the patent dispute.  SiRF also points to comments

11  made by the ALJ that reflect poorly on Orrick's representation of SiRF before the ITC.

12  I.      Exclusion of the Supplemental Expert Reports

13      In the course of the 602 Investigation, Orrick retained Dr. Stephen Heppe ("Heppe") as an

14  expert witness for SiRF.  Cooper Dec. ¶ 9.  The Procedural Schedule ordered by the ALJ for the 602

15  Investigation required that expert reports be filed by February 11, 2008, and rebuttal reports be filed

16  by February 25, 2008.  *Id.*, Exh. K (Procedural Schedule) at 2.  These dates were later changed to

17  February 25 and March 10, respectively.  Docket No. 63 (Foster Dec.), Exh. T (Joint Motion to

18  Amend Procedural Schedule) at 1; *id.* (Order No. 14).  The Ground Rules in effect for the

19  Investigation required that expert disclosures be supplemented as needed pursuant to Commission

20  Rule 210.27(c).  Cooper Dec., Exh. J (Ground Rules) at 17.  However, all "significant opinions"

21  were to be included in the initial and rebuttal reports: "Supplemental reports should not be used to

22  raise new topics not covered in the expert's initial or rebuttal reports, and a supplemental report may

23  be stricken if it does."  *Id.*  Heppe initially prepared an expert report opining that Broadcom's six

24  patents were invalid, and shortly after prepared a rebuttal report opining that SiRF's products did not

25  infringe any of the six patents at issue.  Heppe then produced two supplemental reports, dated April

26  4 and April 8, 2008, addressing the invalidity of Broadcom's patents.  *Id.*, Exh. BB (April 4 Report);

27  *id.*, Exh. CC (April 8 Report).

28

3

Broadcom moved *in limine* to exclude the two supplemental reports as untimely. The ALJ cursorily denied the motion at a pre-hearing conference on April 28, 2008, stating simply, "And Complainant's motion *in limine* regarding Dr. Happe [sic] is denied." Cooper Dec., Exh. V (Orrick's April 28 Transcript) at 6. However, on May 8, 2008, during the evidentiary hearing, Broadcom resurrected the admissibility of the supplemental reports by objecting when Heppe testified about a document upon which, according to Broadcom, he had not relied in any of his timely-filed expert reports, but had relied upon in his supplemental reports. Foster Dec., Exh. U (SiRF's May 8 Transcript) at 2419-20. After clarifying that the supplemental report had been filed late and without leave, *id.* at 2420-21, the ALJ asserted that while he had previously denied the *in limine* motion to exclude the reports, *id.* at 2424, the reports were "fair game for objections, too. All I did was to basically defer a ruling until I could hear the arguments in context and understand why the objections are being raised." *Id.* at 2424-25. The ALJ sustained the objection, and excluded the supplemental reports and all of Heppe's testimony related to the reports. *Id.* at 2426.

Later that day, Orrick attorney Bas de Blank ("Blank") reported on the hearing to SiRF's in-house licensing attorney, Anne di Pasquale ("Pasquale"), via phone. Foster Dec., Exh. A-4 (Pasquale Dec.) ¶¶ 3-5. Pasquale's notes of the conversation reflect, "Biggest Surprise: The judge excluded the supplemental expert reports of SiRF." *Id.*, Exh. Z (Pasquale's Notes) at SIR00033879. But the "[p]ractical significance is not that great" as Heppe could continue to point to the initial expert reports. *Id.* at SIR00033879-80. SiRF would ask for "reconsideration of this rash decision," formed possibly because the ALJ was tired at the end of the day or "mistakenly thought he didn't decide this issue." *Id.* at SIR00033880.

The next day, SiRF moved for reconsideration, claiming extreme prejudice. Foster Dec., Exh. V (SiRF's May 9 Transcript) at 2471. SiRF insisted that it had a right to rely on the ALJ's prior denial of the *in limine* motion, had prepared its case in reliance on that denial and now lacked access to Heppe under the ITC's sequestration orders. *Id.* at 2472. In response, Broadcom reiterated that the supplemental reports were filed late such that Broadcom was denied a "fair and full opportunity to deal with them." *Id.* at 2473-75. Responding to the ALJ's skepticism that SiRF

4

could have prepared its case in reliance on the denial when the *in limine* motion was in fact denied on the same day the hearing began, with no break between the pre-hearing conference and the hearing, *id.* at 2477-78, SiRF claimed to have been constantly revamping its case based on daily reviews of the trial record and documents, *id.* at 2478-79.  Because SiRF had been allotted only five days to present its case, it had to "pick[] the very best defenses to conserve our time based on that ruling and what would go in.  So we did not prepare [Heppe] on defenses we would have presented had your ruling not been a denial of the [*in limine* motion]. . . . And if you now stay with your ruling yesterday, you're going to cut off many of our best defenses and leave us with our second-best defenses. . . . And we can't revamp it now without access to this witness [Heppe].  And so that's why the prejudice is extreme." *Id.* at 2479-80.  The ALJ denied SiRF's motion for reconsideration, *id.* at 2480, and the supplemental reports were excluded from the hearing.

II.   Claim Construction

        The ALJ presiding over the 602 Investigation did not hold a pretrial *Markman* hearing to determine claim construction, and instead waited to construe the claim terms in the Initial Determination until the completion of the evidentiary hearing.  Docket No. 64 (Joint Statement of Undisputed Facts) ¶¶ 1 & 2.  Throughout the evidentiary hearing SiRF presented defenses based on alternative claim constructions .  *See*, *e.g.*, Orrick's May 8 Transcript at 2372 (At the request of SiRF's attorneys, Heppe considered claim constructions proposed by both Broadcom and SiRF, as well as additional theories and hypotheses); Cooper Dec., Exh. I (Orrick's May 9 Transcript) at 2621 (Heppe "wasn't limiting his opinions just to SiRF's proposed construction. . . . [I]t would be very strange for an expert opposing the validity of the patent to just assume the construction of the Respondents because, obviously, validity is an issue that needs to be considered under both sets of constructions"); *id.*, Exh. X (Initial Determination) at 198 ("SiRF has proposed various constructions [of "sequential estimator"] in this investigation, depending on the circumstances. . . . Dr. Heppe's invalidity report initially proposed a broad construction . . . . Dr. Heppe later disavowed that position and argued, in his noninfringment expert report, that the sequential estimator element is narrowly limited . . . . Now, respondents offer another interpretation in their brief.").  Broadcom provided

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1   analysis of alternative claim constructions as proposed by SiRF and Broadcom.  Orrick's May 9

2   Transcript at 2621.

3         SiRF alleges that Orrick's poor preparation, rather than uncertainty regarding the ALJ's

4   future decision, accounts for the multiple claim constructions presented during the 602 Investigation.

5   In an August 2007 internal Orrick email, Blank offered a "proposed construction" for certain patent

6   terms, expressed that he was "still a little nervous about this since I don't know how it will impact

7   either our noninfringment or invalidity position" and favored "just saying that the terms do not

8   require construction and then, when we get their invalidity position, see where we disagree and

9   supplement to identify terms."  Foster Dec., Exh. G (Email from Blank to SiRF OHS ALL (Aug. 23,

10  2007, 9:58 AM)).  Orrick attorney Theresa Norton ("Norton") responded, "I'm with you. . . . I have

11  no clue how this will affect infringement.  Yikes."  *Id.* (Email from Norton to Blank (Aug. 23, 2007,

12  10:04 AM)).  In February 2008, Orrick attorney Fabio Marino ("Marino") emailed "we need to

13  review/revise our claim construction positions ASAP."  *Id.*, Exh. J (Email from Marino to SiRF

14  OHS ALL and Orrick Attorneys Diana Rutowski and Ulysses Hui ("Hui") (Feb. 11, 2008 11:59

15  AM)).  On April 8, 2008, just weeks before the evidentiary hearing, Orrick attorney Suchi

16  Somasekar ("Somasekar") emailed "I think we need new invalidity arguments based on our current

17  construction of 'dynamic model' for [patent] '187."  *Id.*, Exh. K (Email from Somasekar to Orrick

18  attorney Helen Li (April 08, 2008, 10:28 AM)).  Three days later, Orrick attorney William Anthony

19  ("Anthony") emailed "[w]e will need to check Heppe's expert report to make sure the newly

20  proffered constructions do not leave us without a foundation for his opinions. . . . If there is a

21  problem, we would have to insist on the ability to supplement the report for the new construction."

22  *Id.*, Exh. L (Email from Anthony to Blank and SiRF OHS ALL (April 11, 2008, 10:18 AM)).  The

23  very next day, Anthony emailed, "We shouldn't be agreeing to modify our earlier proffered

24  constructions unless we are sure we are not precluded from offering expert testimony which would

25  happen if Heppe's expert [sic] doesn't support the new construction."  *Id.*, Exh. M (Email from

26  Anthony to Marino, Blank, and SiRF OHS ALL (April 12, 2008, 21:11:15)).  Marino responded,

27  "It's not a question of agreeing, we need to change some of our constructions because we would

28

likely lose.  The real question is whether we need to supplement Heppe's report accordingly on

Monday."  *Id.* (Email from Marino to Anthony, Blank, and SiRF OHS ALL (April 12, 2008, 9:40

PM)).

In addition, Heppe informed Orrick in October 2007 that he had completed a rough draft of

his invalidity report.  *Id.*, Exh. H (Email from Hui to Marino and Blank (Oct. 30, 2007, 16:01:59)).

But Orrick, wanting to postpone the draft becoming discoverable, waited until February 2008 to fly

Heppe into town to discuss the draft and even then tried to push the meeting date back to as close to

the report's February 25 filing due date as possible.  *Id.*; *id.*, Exh. I (Email from Hui to SiRF OHS

ALL (Feb. 8, 2008, 3:43 PM)).

III.     Orrick's Advice Regarding SiRF's Risk

SiRF and Orrick dispute whether Orrick adequately apprised SiRF of the risks the company

faced in the 602 Investigation.  SiRF claims that Orrick painted a deceptively rosy picture of SiRF's

position in the dispute, causing SiRF to approach settlement offers with unrealistic standards that the

company would not have adopted had it been aware of the true risks at stake.

In June 2007, Orrick sent SiRF's General Counsel Nicolas Gikkas ("Gikkas") a

memorandum regarding potential remedies against SiRF in the 602 Investigation.  *See* Foster Dec.,

Exh. AA (Email from Orrick Attorney T. Vann Pearce ("Pearce") to Gikkas (June 22, 2007, 1:59

AM GMT)); *id.* (Memorandum) at 1.  The memorandum argues that SiRF might avoid a violation of

section 337 because its products did not infringe Broadcom's patents until combined, post-

importation, with a particular SiRF service in the United States.  *Id.* at 3.  But the author declined to

make a prediction on this argument until additional facts were developed.  *Id.*  Regardless, the author

found it "unlikely that [Broadcom] will obtain an exclusion order, general or specific, against SiRF's

GPS chips" because the chips had "substantial non-infringing uses and do not infringe any patents

by themselves nor directly induce infringement."  *Id.* at 5-6.  Exclusion would be likely, however, if

the chips were delivered with any information encouraging combination with the SiRF service in the

United States.  *Id.*  The "most likely result of the [ITC] investigation" would be a cease and desist

order against inducing customers to combine SiRF chips with the SiRF service.  *Id.* at 9.

**United States District Court**
For the Northern District of California

7

United States District Court

For the Northern District of California

1        Settlement talks between SiRF and Broadcom had commenced by early 2008 and the parties

2   developed a term sheet outlining a potential settlement framework.  Cooper Dec., Exh. L (Email

3   from Broadcom executive Robert Rango ("Rango") to SiRF's CEO Michael Canning ("Canning")

4   (Jan. 17, 2008, 9:50 PM)) (containing term sheet outlining settlement proposal).  Although this term

5   sheet and email do not indicate whether the settlement applied to the pending district court case, the

6   596 Investigation or the 602 Investigation, a "Patent License and Settlement" document was drafted

7   by Broadcom and circulated to MKCH attorneys Alan MacPherson ("MacPherson") and Steven

8   Levitan ("Levitan"), Orrick attorney Fabio Marino ("Marino"), Gikkas, and SiRF CFO Geoff Ribar

9   ("Ribar") on February 26, 2008.  *Id.*, Exh. M (Email from Levitan to Gikkas, Ribar, Marino and

10  MacPherson (Feb. 26, 2008, 6:36PM)).  This draft agreement explicitly sought to resolve all three

11  pending actions, including the district court case and both ITC investigations.  *See id.* (Patent

12  License and Settlement) ¶ 1.21 (defining "Litigation" as the "District Court Action and the ITC

13  Actions"), ¶¶ 4.1, 4.2, & 4.3 (regarding dismissal of litigation).

14       Upon learning the next morning that SiRF's Board of Directors had withdrawn approval of

15  this settlement, MacPherson sent an email signed by himself, Levitan and Marino to SiRF's

16  Canning, Ribar and Gikkas decrying the Board's action as "a big mistake and not in the best interest

17  of Si[RF]."  Cooper Dec., Exh. N ( Email from MacPherson to Canning, Ribar, Gikkas and Marino

18  (Feb. 27, 2008, 10:38 AM)).  The subject line of this email reads "Comments on SiRF v. Broadcom

19  337 TA 596 and 337 TA 602."  *Id.*  The email first describes several reasons why MKCH and Orrick

20  thought the proposed settlement was "a very good deal."  *Id.*  The email then explores the "downside

21  of not concluding this deal," including (1) a "negative impact" on the ITC ALJ such that prevailing

22  on the merits would be more difficult, (2) the potential that Broadcom would carry through on

23  threats to assert additional patents against SiRF, which would entail years of expensive and time-

24  consuming conflict and "have a significant impact on SiRF's earnings," and (3) the unlikelihood of

25  obtaining such "highly beneficial" terms in any subsequent agreement.  *Id.*  The email goes on to

26  note that "[t]his is an opportunity for SiRF to put behind it three expensive cases (two ITC cases and

27  one District Court case) with little to no upside and potentially large downside.  By settling the case

28

8

United States District Court

For the Northern District of California

at this time[,] SiRF will avoid the possibility of having three (3) of its patents held by a judge to be either noninfringed, invalid or both. . . . The negative impact on SiRF of going through the hearing and losing is not capable of being quantified, but is surely significant." *Id.* In conclusion, the attorneys urge SiRF to reconsider the settlement proposal: "We (both MKCH and Orrick) strongly and without hesitation recommend conclusion of the settlement with Broadcom on the terms that have been basically agreed upon." *Id.*

Later that evening, however, Orrick suggested that SiRF could easily avoid any conflict with five of the patents at issue in the 602 Investigation "by simply disabling the SGEE server and SynchFreeNav." Foster Dec., Exh. CC (Email from Marino to Gikkas (Feb. 27, 2008, 6:27 PM GMT)). Orrick later encouraged SiRF to develop such a technical "design-around" so that Orrick could present evidence supporting a limited remedy should the ITC find that SiRF's products, as then configured, infringed Broadcom's patents. *See id.*, Exh. DD (Email from Marino to Gikkas and SiRFs Adam Fineberg ("Fineberg") (April 12, 2008, 5:12 PM GMT)); *id.*, Exh. EE (Email from Gikkas to Seven SiRF Employees (April 15, 2008, 2:47 PM)) (explaining need for revised software code). Orrick insisted the design-around was only needed "to account for the worst case scenario," *id.*, Exh. FF (Email from Marino to Fineberg and Gikkas (April 16, 2008, 3:38 PM GMT)), an opinion either shared by or communicated to Gikkas earlier, Email from Gikkas to Seven SiRF Employees (April 15, 2008, 2:47 PM) ("Although our legal team does not anticipate a worst case scenario, we need to have a contingency plan in place just in case.").

In any event, SiRF's Board of Directors remained unswayed by the combined MKCH and Orrick email urging settlement with Broadcom. The Board cited two issues of "major importance." Cooper Dec., Exh. P (SiRF March 3, 2008 Submission) at SIR00036941. Particularly, SiRF found the defensive suspension right offered by Broadcom too narrow to adequately protect SiRF's products, *id.* at SIR00036941-42, and the change-of-control provisions too limited to serve SiRF's interests, *id.* at SIR0036942.

On February 28, 2008, one day after MKCH and Orrick futilely urged SiRF to reconsider Broadcom's settlement proposal, SiRF filed an annual Form 10-K with the Securities and Exchange

United States District Court

For the Northern District of California

1  Commission.  Under "Risk Factors," the report notes that litigation involving patents or intellectual

2  property "could be costly, time-consuming and may result in our loss of significant rights."  Cooper

3  Dec., Exh. O (Form 10-K) at 15.  The report acknowledged the risk that SiRF might not prevail in

4  litigation to protect or defend these rights and listed the District Court case and two ITC

5  Investigations involving Broadcom as examples of pending litigation.  *Id.*  The report goes on to

6  note the potential consequences should SiRF lose any litigation, including being made subject to an

7  injunction preventing the sale of SiRF products or use of SiRF technology or to an ITC order

8  prohibiting the importation into the United States of SiRF products and those of SiRF's customers.

9  *Id.* at 15-16.

10         The February 2008 Form 10-K is consistent with SiRF's earlier ITC complaint against

11 Broadcom.  In that complaint, SiRF requested (1) a permanent exclusion order prohibiting entry into

12 the United States of Broadcom's infringing products and (2) permanent cease and desist orders

13 prohibiting Broadcom from importing, selling or promoting infringing products.  596 Complaint at

14 29.  Gikkas verified that complaint on February 7, 2007, acknowledging that he was familiar with

15 the allegations and statements contained therein.  Cooper Dec., Exh. A (Verification of Complaint).

16         SiRF was further informed about the risks consequential to losing the 602 Investigation when

17 Orrick forwarded the ITC Staff's Pre-Hearing Statement to Gikkas on April 22, 2008.  *See* Cooper

18 Dec., Exh. FF (Email from Pearce to Gikkas (April 22, 2008, 9:49 PM GMT)).  The ITC staff

19 expected the evidence to show that SiRF had infringed two of Broadcom's patents and

20 recommended a limited exclusion order directed at SiRF as well as cease and desist orders

21 prohibiting the sale of SiRF's infringing products within the United States.  *Id.*, Exh. Q (ITC Staff

22 Statement) at 50-52.  In a followup email, however, Orrick downplayed the significance of the staff

23 statement.  *Id.*, Exh. GG (Email from Marino to Gikkas (April 22, 2008, 10:56 PM GMT)).  Marino

24 first reiterated that the staff statement indicated that four of the six Broadcom patents at issue had

25 not been infringed and then observed that a technical work-around was available for the two

26 remaining patents.  *Id.*  Marino concluded the email with a vote of confidence: since the ITC staff

27 had not participated in the deposition of SiRF's main witness on the invalidity of the patents which

28

United States District Court

For the Northern District of California

1  the staff found to be infringed, "we remain confident in our invalidity defenses with respect to those

2  patents." *Id.*

3  IV.   ALJ Comments

4      The ALJ in the 602 Investigation noted several deficiencies in SiRF's representation

5  throughout the hearing.  For instance, the ALJ identified inconsistent arguments by SiRF regarding

6  the conception and ownership of Broadcom's '346 patent; at various times, SiRF argued that Charles

7  Abraham ("Abraham") conceived of the invention, that Abraham did not conceive of the invention

8  and that Abraham had stolen the invention from a co-worker.  Initial Determination at 36.  When

9  construing the claim term "inner product," the ALJ observed that SiRF's "current proposed

10 construction" was "directly contrary to the positions taken in Dr. Heppe's validity expert report."

11 *Id.* at 56.  The ALJ went on to state that Heppe's analysis would have been "much more useful" had

12 it "set forth from the beginning a proposed construction that he believed to be accurate, and upon

13 which [SiRF] could have constructed a sound, reliable and consistent set of argument [sic] that could

14 be used throughout their case." *Id.* at 57.  The ALJ also looked unkindly on Heppe's inconsistent

15 and contradictory statements regarding construction of "long term satellite tracking data." *See id.* at

16 82-83.  Later, the ALJ flatly discounted Heppe's analysis, which the ITC Staff had cited in support

17 of a proposed claim construction: "Given Dr. Heppe's numerous changes of position at the hearing

18 in this investigation from the positions articulated in his initial expert report, Staff's reliance upon

19 his testimony is misplaced.  The testimony of Dr. Heppe is given little weight by this court." *Id.* at

20 121 n.42.  This disapprobation was later reiterated: "As noted previously, in a number of instances,

21 Dr. Heppe has changed his position at the hearing from earlier positions set forth in his initial expert

22 report.  Also, as earlier noted, this has adversely affected his credibility." *Id.* at 129.

23

24 LEGAL STANDARD

25     Summary judgment is proper when the pleadings, discovery and affidavits show that there is

26 "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

27 matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

28

United States District Court

For the Northern District of California

1   proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for

2   summary judgment bears the burden of identifying those portions of the pleadings, discovery and

3   affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*,

4   477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at

5   trial, the moving party need only point out "that there is an absence of evidence to support the

6   nonmoving party's case."  *Id.* at 325.

7       Once the moving party meets its initial burden, the nonmoving party must go beyond the

8   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

9   genuine issue for trial."  Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

10  party's allegations.  *Id.*; *see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th

11  Cir. 1994).  The court may not make credibility determinations and inferences drawn from the facts

12  must be viewed in the light most favorable to the party opposing the motion.  *Anderson*, 477 U.S. at

13  249; *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991).

14

15  <u>DISCUSSION</u>

16      SiRF's complaint alleges eight instances of malpractice committed by Orrick.  In its motion

17  for partial summary judgment, Orrick contends that, even viewing the record in the light most

18  favorable to SiRF, five of those theories fail as a matter of law.  Specifically, Orrick asserts that

19  SiRF cannot establish that Orrick committed malpractice by:

20

21      a.  failing to properly advise SiRF of the scope of potential remedies to which SiRF
        could be subjected if [Broadcom] prevailed in the '602 Investigation and the potential
22      consequences to SiRF;

23      b.  failing to complete its analysis of [SiRF's] infringement positions prior to serving
        the Invalidity Report;

24      c.  adopting positions during the '602 Investigation regarding the validity of the
        Patents which materially compromised [SiRF's] infringement defenses at the
25      Hearing;

26      . . . .

27      e.  on learning of the deficiencies of the Reports, failing to take the necessary steps to
        ensure that the Supplemental Reports would be admissible at the Hearing;

28

12

f.  failing to advise SiRF of the conflicting opinions contained in the Validity and Infringement Reports, the deficiencies in these reports which necessitated the preparation of the Supplemental Reports, the untimely service of the Supplemental Reports, and the need to seek relief from the ALJ in order to present the evidence contained in the Supplemental Reports at the Hearing.

Compl. ¶ 30.

These averments fall naturally into two categories: (1) allegations regarding deficiencies in the information Orrick conveyed to SiRF regarding the specific risks posed by the 602 Investigation, Compl. ¶ 30(a), (f); and (2) allegations regarding the manner in which Orrick presented SiRF's substantive defenses (including claim construction, invalidity and noninfringement) to the ITC, *id.* ¶ 30 (b)-(c), (e).  In its motion, Orrick claims that SiRF has failed to present admissible evidence to establish a triable issue of fact with respect to either of these professional negligence theories. Before addressing each of Orrick's contentions, the court explores the contours of duty, breach and causation in the context of legal malpractice.

I.    Malpractice

"In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." *Coscia v. McKenna & Cuneo*, 25 Cal. 4th 1194, 1199 (2001).

A.    Duty and the Standard of Care

An attorney has a duty to "to represent his client with 'such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.' " *Lipscomb v. Krause*, 87 Cal. App. 3d 970, 975 (1978) (quoting *Ishmael v. Millington*, 241 Cal. App. 2d 520, 523 (1966)).  In addition, "a lawyer holding himself out to the public and the profession as specializing in an area of the law must exercise the skill, prudence, and diligence exercised by other specialists of ordinary skill and capacity specializing in the same field." *Wright v. Williams*, 47 Cal. App. 3d 802, 810 (1975).  The existence of a duty is a question of law decided by the court, *Osornio v. Weingarten*, 124 Cal. App. 4th 304, 319-20 (2004);

13

United States District Court

For the Northern District of California

Orrick, however, does not (and likely could not) contest the existence of a duty in the instant case, as the errors that SiRF alleges constitute professional negligence plainly arose within the context of Orrick's representation of SiRF in the 602 Investigation.

The exact contours of the standard of care in a professional negligence case are a question of law as well. However, whereas expert testimony is not permitted to help the finder of fact understand the "reasonable person" standard applicable in the mine run of negligence cases, expert testimony addressing the standard of care is almost always required in legal malpractice cases. This is so because knowledge of an attorney's responsibilities toward a client are not within the common knowledge of the jury. *See Landeros v. Flood*, 17 Cal. 3d 399, 410 (1976). The only exception to the expert testimony requirement is where " 'the conduct required by the particular circumstances is within the common knowledge of the layman.' " *Id.* (quoting *Sinz v. Owens*, 33 Cal. 2d 749, 753 (1949)); *see Unigard Ins. Group v. O'Flaherty & Belgum*, 38 Cal. App. 4th 1229, 1239 (1995) ("In negligence cases arising from the rendering of professional services, as a general rule the standard of care against which the professional's acts are measured remains a matter peculiarly within the knowledge of experts. Only their testimony can prove it, unless the lay person's common knowledge includes the conduct required by the particular circumstances."). "It is therefore axiomatic that summary [judgment] is inappropriate where both parties have submitted conflicting expert testimony concerning the attorney's standard of care." *Greenberg Traurig, LLP v. Gale Corp.*, No. 2:07-cv-01572-MCE-DAD, 2009 WL 2390533, at *4 (E.D. Cal. Aug. 6, 2009).

B.    Breach

"Breach of duty is usually a fact issue for the [fact finder]; if the circumstances permit a reasonable doubt whether the defendant's conduct violates the boundaries of ordinary care, the doubt must be resolved as an issue of fact by the [fact finder] rather than of law by the court." *Ishmael,* 241 Cal. App. 2d at 525; *see also Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153 (S.D. Cal. 2008). "Breach of a duty of reasonable care in a professional malpractice situation is the failure of an attorney to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise." *Id.* (citing *Osornio,* 124 Cal. App. 4th at 319).

14

United States District Court

For the Northern District of California

1    Again, because "such standard and skill is not a matter of general knowledge," expert testimony is

2    necessary to "establish . . . the propriety of particular conduct by the practitioner in particular

3    circumstances." *Id.* (citing *Lipscomb,* 87 Cal. App. 3d at 975). Expert testimony can be eschewed

4    only "[w]here the failure of attorney performance is so clear that a trier of fact may find professional

5    negligence unassisted by expert testimony. . . ." *Wilkinson v. Rives*, 116 Cal. App. 3d 641, 647-48

6    (1981). If the parties produce conflicting, admissible expert reports regarding whether the standard

7    of care has been breached, summary judgment is inappropriate. *Id.*

8                        1.    Judgmental Immunity

9         In its moving papers, Orrick insists that it is insulated from liability by what is known as the

10   "judgmental immunity doctrine." The term judgmental immunity is a misnomer, as the doctrine

11   does not absolve or exempt a defendant from liability for his or her conduct. *See Blanks v. Shaw*,

12   171 Cal. App. 4th 336, 378 (2009). Rather, when courts discuss judgmental immunity, "they are

13   actually addressing the factual issue as to whether an attorney breached the standard of care." *Id.*

14   Although an attorney is "expected to possess knowledge of those plain and elementary principles of

15   law which are commonly known by well informed attorneys, and to discover those additional rules

16   of law which, although not commonly known, may readily be found by standard research

17   techniques," *Smith v. Lewis*, 13 Cal. 3d 349, 358 (1975), *overruled on other grounds*, *In re Marriage*

18   *of Brown*, 15 Cal. 3d 838 (1976), the doctrine holds that an attorney does not breach the standard of

19   care where an "honest error in judgment concerning a doubtful or debatable point of law" results in

20   an unfavorable result for a client, *Davis v. Damrell*, 119 Cal. App. 3d 883, 887 (1981). In order to

21   benefit from the doctrine, an attorney must establish two elements: (1) "that there were unsettled or

22   debatable areas of the law that were the subject of the legal advice rendered," and (2) that the

23   "advice was based upon 'reasonable research in an effort to ascertain relevant legal principles and to

24   make an informed decision as to a course of conduct based upon an intelligent assessment of the

25   problem.' " *Blanks*, 171 Cal. App. 4th at 378-79 (quoting *Smith*, 13 Cal. 3d at 359). Only where

26   there is no factual dispute that an attorney "[h]as conducted a 'thorough, contemporaneous research

27   effort,' demonstrated 'detailed knowledge of legal developments and debate in the field,' and made a

28

                                                      15

United States District Court

For the Northern District of California

1  decision which represented a 'reasoned exercise of an informed judgment grounded upon a

2  professional evaluation of applicable legal principles,' " is that attorney entitled to summary

3  judgment under the judgmental immunity doctrine. *Stanley v. Richmond*, 35 Cal. App. 4th 1070,

4  1094 (1995) (quoting *Davis*, 119 Cal. App. 3d at 888)

5      C.     Causation

6      In a litigation malpractice action, a plaintiff establishes causation by showing that "[b]ut for

7  the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more

8  favorable result." *Viner v. Sweet*, 30 Cal. 4th 1232, 1244 (2003). To satisfy this standard, a

9  "plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only 'introduce

10  evidence which affords a reasonable basis for the conclusion that it is more likely than not that the

11  conduct of the defendant was a cause in fact of the result.' " *Id.* (quoting *Ortega v. Kmart Corp.*, 26

12  Cal. 4th 1200, 1205 (2001)) (some quotation marks and citations omitted). Analysis of causation

13  necessarily entails "evaluation of hypothetical situations concerning what might have happened, but

14  did not . . . because the very idea of causation . . . involves comparing historical events to a

15  hypothetical alternative." *Id.* at 1242.

16      In legal malpractice suits, "[t]he method for proving the element of causation has been

17  likened to a 'trial within a trial' or a 'case within a case,' " in which the trier of fact is tasked with

18  determining how the underlying proceeding would have ben resolved had the attorney met the

19  standard of care. *Ambriz v. Kelegian*, 146 Cal. App. 4th 1519, 1531 (2007).

20      The trial-within-a-trial method does not 'recreate what a particular judge or fact
       finder would have done. Rather, the jury's task is to determine what a reasonable
21     judge or fact finder would have done . . . .' Even though 'should' and 'would' are
       used interchangeably by the courts, the standard remains an objective one. The trier
22     of fact determines what should have been, not what the result would have been, or
       could have been, or might have been, had the matter been before a particular judge or
23     jury."

24  *Mattco Forge, Inc. v. Arthur Young & Co.*, 52 Cal. App. 4th 820, 840 (1997) (citations omitted).

25      "[C]ausation . . . is ordinarily a question of fact which cannot be resolved by summary

26  judgment. The issue of causation may be decided as a question of law only if, under undisputed

27  facts, there is no room for a reasonable difference of opinion. The question about what would have

28
                                                 16

1   happened had [the lawyer] acted otherwise is one of fact unless reasonable minds could not differ as

2   to the legal effect of the evidence presented." *Kurinij v. Hanna & Morton*, 55 Cal. App. 4th 853,

3   864 (1997) (quotations marks and citations omitted); *see also Vaxiion Therapeutics, Inc. v. Foley &*

4   *Lardner LLP*, No. 07cv280-IEG(RBB), 2008 WL 5147201, at * 3-4 (S.D. Cal. Dec. 8, 2008)

5   ("Ordinarily, the question of whether plaintiff has demonstrated the outcome would 'more likely

6   than not' have been more favorable in the absence of the lawyer's alleged negligence is an issue of

7   fact which cannot be resolved by summary judgment."). The instances where summary judgment

8   would properly issue to dismiss a case because of an absence of evidence to support causation "[a]re

9   very rare . . . ." *Dawson v. Toledano*, 109 Cal. App. 4th 387, 396 (2003) (denying plaintiff's motion

10  for summary judgment in a legal malpractice suit because of existence of disputed facts regarding

11  whether attorney's conduct caused injury to the plaintiff).

12  III.    Deficiencies in the Information Orrick Conveyed to SiRF Regarding the Risks of the 602
            Investigation

13          SiRF contends that Orrick committed legal malpractice by misadvising SiRF about the risks

14  it potentially faced in the 602 Investigation. Specifically, SiRF claims that Orrick breached the duty

15  it owed to SiRF by (1) incorrectly advising SiRF that a materially detrimental exclusion or cease and

16  desist order would not likely issue against SiRF in the 602 Investigation; (2) failing to inform SiRF

17  that it could be found to have infringed all six patents at issue in the 602 Investigation; and (3)

18  failing to inform SiRF about the extent of the problems Orrick experienced with the ITC

19  Investigation (namely related to claim construction and the exclusion of Heppe's supplemental

20  reports). SiRF claims that had Orrick not breached its duty, SiRF would have settled with

21  Broadcom, thereby achieving a better resolution to the 602 Investigation. Orrick asserts that SiRF

22  has not produced sufficient evidence such that a jury could find that any of the above-referenced

23  conduct rose to the level of malpractice.

24          Neither party has submitted any expert declarations delineating the responsibilities that a

25  patent attorney has in advising his client about the risks inherent to an investigation before the ITC.

26  As is discussed above, in legal malpractice cases, expert testimony is typically required to define the

27  boundaries of the standard of care and to determine if the standard has been breached. Neither party

28

                                                    17

United States District Court

For the Northern District of California

contends that " 'the conduct required by the particular circumstances [of this case were] within the common knowledge of the layman.' " *See Landeros*, 17 Cal. 3d at 410. The absence of this necessary evidence in the instant case would provide sufficient grounds, standing alone, for granting Orrick's motion.

However, even assuming that Orrick's conduct breached the standard of care, SiRF could not, at this stage, establish that Orrick's conduct caused it injury. To survive summary judgment, SiRF must be able to establish that "[b]ut for the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." *Viner*, 30 Cal. 4th at 1244. Put differently, SiRF must be able to show that had Orrick accurately informed SiRF that the ITC proceedings might result in an exclusion or cease and desist order, that the proceedings might result in a finding of infringement of all six patents at issue, or that Orrick had encountered substantial problems pursuing SiRF's substantive defenses, it is more likely than not that SiRF would have agreed to settle the action.

In this vein, the record contains undisputed evidence that SiRF had the opportunity to settle the 602 Investigation. According to Kanwar Chadha, who was a SiRF board member and SiRF's Vice President of marketing in 2007 and 2008, Broadcom presented settlement proposals to SiRF on January 17, 2008, February 26, 2008, March 5, 2008 and March 24, 2008. Foster Dec., Exh. A-2 (Chadha Dec.) ¶ 9. SiRF did not respond to the last of these proposals until April 2, 2008. *See* Foster Dec., Exh. HH (April 2, 2008) (letter from SiRF's attorneys to Broadcom's attorneys containing a counter-offer to the March 24, 2008 settlement offer). With the exception of the malpractice related to Heppe's supplemental reports, all of the alleged breaches took place, at least in part, prior to that date.

SiRF's burden on the motion for summary judgment requires more, however, than simply demonstrating that it *could* have settled the case. It must produce evidence to support a conclusion that, more likely than not, it *would* have settled the case. For that proposition, SiRF has submitted only a single sentence of Chadha's declaration. He explains that "[h]ad Orrick disclosed the true

1   risks the 602 case presented to SiRF, including those risks arising from Orrick's errors in its trial

2   preparation, SiRF could and would have settled the litigation."  Chadha Dec. ¶ 9.

3          Given the other evidence in the record, this naked assertion is insufficient.  The record

4   contains no information regarding the size of SiRF's Board of Directors and how the other directors

5   might have behaved had Orrick not breached its duty to SiRF.  Chadha's declaration does not

6   indicate that he is authorized to speak on behalf of the other directors or on behalf of SiRF as a

7   whole.  Thus, even if Chadha would have accepted one of the Broadcom settlement offers in the

8   absence of Orrick's negligence, there is nothing in the record to indicate that any of the other

9   directors would have acted in a similar manner.  Without evidence to that effect, no reasonable

10  finder of fact could conclude that it was more likely than not that SiRF would have settled the 602

11  Investigation had Orrick accurately informed the Board of Directors of the specific risks posed by

12  the ITC action.

13  IV.    Deficiencies in the Manner in Which Orrick Presented SiRF's <u>Substantive Defenses</u>
        <u>(Including Claim Construction, Invalidity and Noninfringement)</u>

14

15         SiRF also claims that Orrick's substantive mishandling of the 602 Investigation, especially

16  regarding the manner in which Orrick advocated for claim construction of the patents at issue and

    handled Heppe's expert reports, constituted professional negligence.

17

18         A.     <u>Duty and Breach</u>

19         SiRF contends that Orrick breached the standard of care for representing a client in a section

20  337 investigation by "omitting important defenses from expert reports and providing them after the

    applicable deadlines in 'supplements' that were stricken as a sanction for missing the deadlines; and

21
    by failing to timely develop and advocate claim constructions (instead deferring constructions),

22
    offering multiple constructions without advocating for one, offering damagingly inconsistent

23
    constructions, and constantly shifting constructions."  SiRF claims that most of these failings were

24
    the product of Orrick's lack of preparedness.

25
           SiRF submitted expert testimony from Arthur Wineberg ("Wineberg"), a partner at Akin

26
    Gump Strauss Hauer & Feld, LLP, in order to establish the standard of care a patent attorney should

27
    exercise in litigating a section 337 action before the ITC and whether Orrick's conduct met that

28
                                                  19

United States District Court

For the Northern District of California

1    standard.  In his over thirty-years as a patent litigator, Wineberg has tried numerous section 337

2    patent cases before the ITC.  Foster Dec., Exh. A-1 ¶ 3.  In addition, Wineberg is a former President

3    of the ITC Trial Lawyers Association and previously served as Director of the Office of Unfair

4    Import Investigations within the ITC.  *Id.* ¶¶ 4-5.  Orrick does not question Wineberg's

5    qualifications as an expert in the field.

6         In his declaration, Wineberg explains that the standard of care for a respondent's defense is

7    two-fold.

8         First, the standards requires that claim constructions and defenses be timely presented
         – e.g., within the deadlines governing interrogatory answers and the filing of expert
9        reports on invalidity and noninfringement.  Second, the standards require that claims
         be persuasively construed, avoiding any failure of construction that leaves a gap to be
10       filled by other parties, and avoiding later inconsistencies and changes that undermine
         credibility.

11   *Id.* ¶ 13.  Further expanding upon the second standard, Wineberg states that

12        When analyzing and arguing invalidity or noninfringement an attorney or expert may
13       address alternative claim constructions being offered by other parties, as well [as] his
         or her own.  But, since the judge is looking to the parties for the proper claim
14       construction, it is not within the standards of care for an attorney simply to offer,
         directly or through an expert, multiple alternative claim constructions without
15       advocating on behalf of the client that a particular construction is the proper one.
         Failure to identify the proper claim construction, and to explain why it is the proper
16       construction, abandons a key function of counsel.

17   *Id.*

18        After conducting a "preliminary review" of some of the records in this case, *id.* ¶¶ 9-10,

19   Wineberg opines that Orrick breached the first duty by failing to include its best arguments,

20   including the proper constructions of claim terms, in the February 25, 2008, invalidity report and the

21   March 10, 2008, infringement report.  *Id.* ¶ 14(c).  It is undisputed (in fact Orrick itself admitted)

22   that SiRF's best arguments were only presented to the ITC in Heppe's supplemental reports, which

23   were filed after the deadline for amending substantive contentions.  It is further undisputed that the

24   ALJ ultimately excluded those reports precisely because Orrick missed the relevant deadlines.

25        Wineberg states that Orrick breached the second duty by failing, from the very start of the

26   Investigation, "to identify and advocate a specific construction for each claim term so that the judge

27   could determine the proper construction."  *Id.* ¶ 14(a).  In particular, Wineberg explained that

28

1   Orrick's argument of "no claim construction needed" for certain claims was entirely unacceptable,

2   as even if the words should be interpreted according to their plain meaning, "Orrick should have

3   provided the judge with what Orrick contended were the plain meanings." *Id.* Wineberg further

4   faults Orrick for "provid[ing] changing and, at times, inconsistent claim constructions and defense . .

5   . without advocating which it contended was the proper construction." *Id.* ¶ 14(b). In reaching these

6   conclusions, Wineberg points to portions of the Initial Determination in which the ALJ explicitly

7   questioned Orrick's claim construction strategy.

8          Notwithstanding Wineberg's declaration, which is more than sufficient to create a disputed

9   issue of material fact regarding breach, Orrick suggests that it is entitled to a finding of non-breach

10  pursuant to the judgmental immunity doctrine. This argument, while novel, is entirely misplaced.

11  For even if the court were to hold that the judgmental immunity doctrine applied to claim

12  constructions, a dubious position (at best) not supported by any precedent, the doctrine would not

13  protect Orrick, at least not at this stage of this litigation. In order to benefit from the doctrine, a

14  party defending a malpractice dispute must be able to demonstrate that the advice or course of action

15  it selected "was based upon 'reasonable research in an effort to ascertain relevant legal principles

16  and to make an informed decision as to a course of conduct based upon an intelligent assessment of

17  the problem.' " *Blanks*, 171 Cal. App. 4th at 378-79 (quoting *Smith*, 13 Cal. 3d at 359). Wineberg's

18  declaration, which states that Orrick's conduct was neither based on reasonable research nor the

19  product of an informed decision, creates a triable issue of fact as to whether Orrick should be

20  protected by the doctrine. Furthermore, Orrick cannot possibly argue that its attorneys' failure to

21  submit critical defenses by a strict, unambiguous deadline was a reasoned decision.[2]  Accordingly,

22  the court holds that, viewing the record in the light most favorable to SiRF, Orrick's conduct with

23  respect to claim construction in the 602 Investigation could be found to fall below the appropriate

24  standard of care.

25          B.    Causation

26          Having held that a jury could conclude that Orrick's conduct breached the duty it owed to

27  SiRF, the court turns to whether SiRF has produced sufficient evidence of a causal nexus between

28

United States District Court

For the Northern District of California

1   Orrick's conduct and the injury it suffered.  The issue of causation necessitates that the court,

2   viewing the facts in the light most favorable to the plaintiff, conduct a trial within a trial.  Through

3   this inquiry the court must determine whether SiRF would have obtained a more favorable result in

4   the 602 Investigation had Orrick met the standard of care.  The hypothetical causal trail this requires

5   the court to travel is dizzying, to say the least.  First, the court must determine whether—had Orrick

6   presented consistent claim construction theories (as opposed to presenting inconsistent, changing

7   claim constructions at different stages of the investigation), argued alternative claim constructions

8   but advocated for the construction most beneficial to SiRF, or submitted the arguments that were

9   contained in the Heppe's supplemental reports so that they were admitted at the hearing—SiRF

10  would have fared more favorably in the 602 Investigation, i.e., whether a reasonable ALJ would

11  have found any of the six Broadcom patents invalid or would have concluded that the SiRF devices

12  at issue infringed fewer claims or patents.  Depending on the answer to that initial question, the court

13  may also be forced to speculate as to whether a reasonable ALJ would have reached a different

14  ultimate result, i.e., the ALJ would not have issued cease and desist or exclusion orders or would

15  have issued less detrimental orders.

16         The finder of fact is not, however, expected to navigate through this parallel universe without

17  guidance from the parties.  SiRF has not presented the court with any blueprint for how the

18  underlying investigation should have been conducted.  Specifically, SiRF does not identify what

19  claim constructions Orrick should have advocated before the ALJ.  Without such information, the

20  court cannot begin to conduct the trial within a trial.  It is surely not the court's responsibility to

21  independently review the patents and infringing products at issue, conceive of all possible claim

22  constructions and determine how a reasonable ALJ would have resolved the patent dispute had he or

23  she been presented with all of the conceivable constructions.

24         Expert opinion submitted by SiRF might[3] have provided a roadmap of the case within a case.

25  Here, however, the expert declaration submitted by SiRF contains only a single, legally inadequate

26  sentence addressing causation.  Wineberg states that his "review of the ALJ's determinations shows

27  that, because of the above-discussed breaches, the ALJ repeatedly rejected SiRF's claim

28

22

United States District Court

For the Northern District of California

1    constructions and defenses, often adopting the Petitioners' claim constructions because they were

2    the ones the ALJ was given in a timely, concrete, and consistent manner." Foster Dec., Exh. A-1

3    (Wineberg Dec.) ¶ 15.  Read in the light most favorable to SiRF, Wineberg's statement merely

4    explains that, in his expert opinion, Orrick's breaching conduct played a substantial role in

5    producing the detrimental result that actually occurred in the 602 Investigation.  Wineberg fails to

6    address, even tangentially, what would have transpired at the ITC had Orrick met the standard of

7    care and whether those hypothetical proceedings before a reasonable ALJ would have produced a

8    better result for SiRF.  As Orrick correctly points out, Wineberg does not identify what claim

9    constructions Orrick should have presented to the ITC, how such claim constructions would have

10   resulted in the patents at issue being declared invalid or unenforceable, or how conforming conduct

11   would have resulted in fewer findings that SiRF's products infringed Broadcom's patents or less

12   onerous (or no) cease and desist and exclusion orders.   Consequently, no fact finder could rely on

13   Wineberg's declaration to conclude that "[b]ut for the alleged malpractice, it is more likely than not

14   that the plaintiff would have obtained a more favorable result." *Viner*, 30 Cal. 4th at 1244.

15           No other portions of the record even speak to the causation element of malpractice.  The

16   evidence that comes closest are the statements made by Orrick's attorneys while arguing for the ALJ

17   to reconsider his decision to exclude Heppe's expert reports, in which they admit that Orrick's late

18   filing of the reports resulted in the exclusion of SiRF's "very best defenses" and would result in

19   SiRF suffering "extreme" prejudice.  But even if the finder of fact were to assume that Orrick's

20   failure to ensure that the supplemental reports were admitted into evidence constituted a breach of

21   the standard of care, that the supplemental reports contained SiRF's best arguments regarding claim

22   construction, invalidity and non-infringement, and that SiRF was therefore precluded from

23   presenting those arguments as a direct result of Orrick's negligence, SiRF has not carried its burden.

24   There is still an absence of any evidence in the record to support a conclusion that the outcome of

25   the 602 Investigation would have been any different had Orrick been able to present SiRF's best

26   arguments.

27

28
                                                      23

Otherwise the evidence on which SiRF relies to establish causation—including the ALJ's statements in the ITC decision disparaging Orrick's representation and Wineberg's declaration—are relevant to breach, not causation. The court will not, as SiRF implicitly requests, infer causation from breach. As a result, on the record before the court, no finder of fact could conclude that Orrick's substantive defense of SiRF in the 602 Investigation caused injury to SiRF.

V.    SiRF's Rule 56(f) Motion for Additional Discovery

As the preceding discussion indicates, Orrick has carried its burden on its motion for summary judgment. With respect to the advice-related malpractice claims, Orrick demonstrated that SiRF failed to produce sufficient evidence to establish the parameters of the standard of care, breach or causation. Similarly, Orrick has identified a void of evidence to support SiRF's claim that the substantive representation Orrick provided to SiRF caused SiRF any injury.

Perhaps having anticipated this result, SiRF moved the court, pursuant to Federal Rule of Civil Procedure Rule 56(f), for time to conduct additional discovery. Rule 56(f)(2) states that "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken." Fed. R. Civ. P. 56(f)(2). The rule "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002).

Although it is a close issue, SiRF is entitled to additional discovery. The evidence SiRF seeks—depositions of the Orrick attorneys who represented SiRF and Heppe, release of the ITC administrative record once all or part of the protective order is lifted, and a more comprehensive and complete expert review of the documents relevant to this case—may very well address the previously discussed deficiencies in the record. This case is still in its relatively early stages. Furthermore, Orrick's motion for partial summary judgment targets only five of the eight malpractice claims, and does not seek the dismissal of SiRF's breach of contract, breach of fiduciary duty and misrepresentation claims. Thus, even if the court were to grant summary judgment on the

24

United States District Court

For the Northern District of California

1  claims for which Orrick seeks dismissal, this action, along with significant accompanying discovery,

2  would continue.  Given the status of the case, Orrick will suffer little prejudice if SiRF is entitled to

3  conduct additional discovery to support its claims of malpractice.  Accordingly, SiRF's motion for

4  additional discovery pursuant to Rule 56(f) is GRANTED.

5

6  CONCLUSION

7        For the reasons discussed above, defendant Orrick, Herrington and Sutcliffe LLP's partial

8  motion for summary judgment is DENIED without prejudice.  Plaintiff SiRF Technology Inc.'s

9  motion for additional discovery pursuant to Rule 56(f) is GRANTED.

10        IT IS SO ORDERED.

11

12

Dated: June 21, 2010

13                                             _____
                                             MARILYN HALL PATEL
14                                             United States District Court Judge
                                             Northern District of California

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

## ENDNOTES

1.  In order to resolve the instant motion, the court has had to refer to a number of documents that the parties have legitimately placed under seal.  The court is confident that the parties have abided by the relevant protective order in the ITC and have also properly taken into account how information from this litigation might affect other litigation between SiRF and Broadcom.  Nonetheless, this court finds it necessary to discuss some of the facts contained in the sealed exhibits, and must do so in a decision that is not under seal, because this is a public forum.

2.  Orrick attempts to argue that the proper consideration is whether it was justified in relying on the ALJ's earlier denial of Broadcom's motion *in limine* to prevent the admission of the supplemental reports.  But SiRF does not allege that Orrick's reliance on the ALJ's *in limine* decision fell below the standard of care.  SiRF avers that Orrick committed legal malpractice by missing the deadline for submitting substantive arguments regarding invalidity and infringement, a fact that Orrick does not dispute.  Accordingly, whether Orrick properly relied upon the ALJ's *in limine* decision is irrelevant to the resolution of its motion for summary judgment.

3.  California evidentiary law does not permit an expert in a malpractice case to opine on any of the ultimate issues of fact. *See Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 973 (2001) (holding that in legal malpractice action, it was reversible error for the trial court to permit expert testimony regarding what the outcome of the underlying litigation would have been had the attorneys met the standard of care); *see also Davcon, Inc. v. Roberts & Morgan*, No. D032752, 2006 WL 541024, at *3-4 (2006) (citing treatise for proposition that, in a legal malpractice action, "[u]sually, expert testimony is not proper to establish what the result would have been, since that does not involve the expertise of a lawyer witness.  A further rationale is that resolving the underlying case ordinarily is within the expertise of the jury."). Federal evidentiary law is somewhat more permissive. *See Nationwide Transp. Fin. v. Cass Info. Fin. Syss, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("As a general rule, 'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.' ") (quoting Fed. R. Evid. 704(a)).  While it may be within the ability of a jury to resolve a trial within a trial in a more typical case, say breach of contract or ordinary negligence, without the benefit of expert testimony, there is no question that it is beyond the common knowledge of a jury to resolve a patent dispute.  Accordingly, expert opinion is not just permissible, but likely necessary, to resolve the causation of a legal malpractice suit involving complex issues of patent law.